ADRIAN LISTER, a/k/a Adrian Lister Tillman, Plaintiff-Appellant, v. BILL KELLEY ATHLETIC, INC., *et al.*, Defendants-Appellees.

Second District    No. 84—0641

Opinion filed November 1, 1985.

Keith E. Roberts, Sr., Robert R. Verchota, and Rodney W. Equi, all of Donovan & Roberts, P.C., of Wheaton, for appellant.

Craig A. Tomassi, Barry L. Kroll, and C. Barry Montgomery, all of Williams & Montgomery, Ltd., of Chicago, and Henry J. Burt, Jr., and Gary L. Taylor, both of Rathje, Woodward, Dyer & Burt, of Wheaton, for appellees.

JUSTICE STROUSE delivered the opinion of the court:

This action was brought by plaintiff, Adrian Lister, a/k/a Adrian Lister Tillman, to recover damages for permanent injuries he sustained during a high school football game. Plaintiff sued the manufacturer and the retail seller of the football helmet. Following a jury trial, a verdict was rendered in favor of the defendants, and the court entered judgment on the verdict. Plaintiff appeals, raising as his only issue whether defendants' liability for failure to warn was established as a matter of law.

On November 5, 1977, plaintiff, a 17-year-old senior football player at Wheaton Central High School, was injured tackling an opponent during a high school football game. At the time of the injury, plaintiff was wearing a football helmet known as the 100 MH. Plaintiff's injury was a fracture of the cervical spine which resulted in permanent quadriplegia.

Plaintiff then filed a cause of action against Bill Kelley Athletic, Inc. (Kelley), the manufacturer of the helmet, and Hayden Sports Center, Inc. (Hayden), the retail seller of the helmet. Plaintiff's complaint sought recovery on the theories of strict liability, negligence and breach of warranty, alleging that the helmet was "designed, manufactured and sold with insufficient space and padding in the crown and suspension, *** without properly utilizing the available space in the crown area for padding and suspension, *** [and] without an adequate or proper warning that harm could result from the use of the helmet."

The record reflects that during the trial 18 witnesses were called to testify, including plaintiff, high school football coaches, the team physician, the treating physicians, the president of Kelley, the president of Hayden, and engineering experts. This opinion will refer to

only those facts pertinent to plaintiff's sole argument on appeal—that defendants' liability for failure to warn was established as a matter of law.

Plaintiff was injured while tackling an opposing player in a football game. On the play in which he was injured, plaintiff testified he slipped and never regained his balance prior to the tackle. A spectator at the game testified that at the point of impact, plaintiff's head was approximately at waist or thigh level of the ball carrier, and his head was in front of the ball carrier. The head football coach, who testified for the defense, stated that he emphasized to his players the importance of keeping their heads up, not ducked, when tackling. Techniques such as spearing, ramming and butting were outlawed by a 1976 Illinois High School Association rule, which provided that no player could make initial contact with his helmet, whether blocking or tackling. This rule had been repeatedly explained to the players. The coach testified on cross-examination that, in viewing the film of the game in question, he saw no attempt by plaintiff to spear, ram or butt. Instead, it appeared plaintiff was slipping and off balance when he made the tackle.

Portions of plaintiff's deposition testimony were read to the jury. Plaintiff had stated that he was told specifically by his coaches that the top of the helmet could not be used for a tackle, but only the shoulder should be used. He was told that he could injure himself as well as his opponent if the top of the helmet was used. Plaintiff had stated that he did not lose his balance before making the tackle, and it was his intention to tackle with his shoulder. First his head, then his shoulder came into contact with the ball carrier.

The 100 MH helmet worn by plaintiff was manufactured by Kelley in 1976 and was then sold to Hayden, who in turn sold it to the school district. The helmet did not have permanently applied to it any warning that it would not protect against all injuries or that quadriplegia could result while wearing the helmet.

Kelley purchased the equipment to manufacture the 100 MH from Mac Gregor Brunswick in 1975, who had previously manufactured the 100 MH. Kelley bought the molds and duplicated the Mac Gregor design and suspension for the 100 MH. In Kelley's 1975-76 catalog, the 100 MH was described as "100 MH high impact Polycarb helmet" and advertised "the hat is back," referring to the fact that the 100 MH formerly produced by Mac Gregor was back in production, after having been discontinued. The 100 MH had been tested and approved by the National Operating Committee on Safety of Athletic Equipment, a manufacturer-supported organization.

Dr. Igor Paul, a mechanical engineer with an interest in biomechanics and a doctorate degree in mechanical engineering, testified as plaintiff's expert. He investigated plaintiff's injury from a biomechanical standpoint and described in detail the design of the 100 MH helmet, concluding that its suspension was defective. Dr. Paul described what the X rays of the injury disclosed, and opined that the impact occurred at the top of the helmet, slightly to the right of center. He described the injury as a compression-flexion fracture of C-6 with some involvement of C-5 leading to impingement of the spinal cord and quadriplegia. Dr. Paul testified that in his opinion 1,000-1,200 pounds of peak force was necessary to produce that kind of damage, and the lowest level of force that would cause a fracture in plaintiff's spine is about 800-1,000 pounds. Dr. Paul stated that if the amount of force is reduced below 800-1,000 pounds, there would not be a fracture.

The design of a football helmet affects the force that is transmitted to the spine from a blow to the top of the head. The helmet is designed to distribute the blow and to cushion the blow and impact. It provides a cushion between the blow and the head and neck. Dr. Paul used the example of dropping an egg on a piece of wood versus putting some cushioning between the egg and the wood. The cushioning provides room for the egg to decelerate. A helmet is the same thing; the suspension acts as a cushion. The 100 MH has a space between the head and the shell of 1½ inches or 1⅜ inches. When a blow is experienced at the top of the head, the cushioning material compresses and absorbs energy. The basic premise is to use all the space effectively.

Dr. Paul stated that the 100 MH should have been designed so that the suspension would deform at a lower load and would use the entire 1½ inches available, rather than "bottoming out" at three-quarters of an inch as it does. If the distance for deceleration is doubled and the cushioning is doubled, you will reduce the peak force by about half. By effectively designing the suspension, even in this shell size, to utilize more of the space, the helmet would absorb more of the energy and lower the impact force. That would reduce the compressive load on the neck. In this helmet, it should use up all 1½ inches. This helmet was not designed in that manner.

Dr. Paul testified that there are helmets on the market which incorporate those principles to improve performance and prevent neck fractures and spinal cord injuries. Dr. Paul himself has experimented with the 100 MH to determine the effect of applying those principles. Further, a Mac Gregor-Brunswick test report of 1974 shows the same

result. In Dr. Paul's opinion, by either adding more cushioning or slitting the suspension to use up all of the 1½ inches available, the force in the blow to plaintiff would have reduced the force below the 800-pound level and there would have been no compression fracture.

Dr. Paul further testified that there are engineering principles in the design of products which relate to warnings. One of the basic principles of design is to try to design out hazards of products so they will not cause injury, but if the hazard cannot be designed out then the user should be warned by a specific warning as to the potential hazard. The helmet worn by plaintiff had no warning. Dr. Paul stated that for such a warning to be effective, it should be displayed right on the helmet and should use accepted and standard words. It should use the word "danger" or "warning" in an appropriate color code. It should indicate what the specific hazard is, namely the hazard of quadriplegia or death, and the limitations of the product relative to the hazard. It should be right on the helmet so that when one contemplated using the helmet he would have a choice whether he wants to take that chance or not.

Dr. Albert Burstein, the director of the department of biomechanics in a hospital, testified for the defense. Dr. Burstein, who has a doctorate degree in mechanical engineering, has tested football helmets as they relate to the mechanism of injury in neck injuries. He examined how they deform under load and how much force is necessary to make them deform. He specifically tested the Kelley 100 MH, including the one worn by plaintiff on November 5, 1977. Dr. Burstein has examined the forces generated in the helmet and spine and the mechanism for generating those forces. He read Dr. Igor Paul's testimony, and knew of nothing in literature supporting his theory.

For this lawsuit, Dr. Burstein examined the helmet, X rays and medical records of plaintiff, and the game film. His opinion as to the mechanics of the injury was that the injury was due to axial loading, with the bones of the spinal column aligned, and load applied to the base of the cervical spine by virtue of the body pushing up against the cervical spine at the same time the head was confined from moving. The mechanism was therefore the squeezing of the cervical spine between the head and the body. Dr. Burstein then explained the tackle and effect by the use of charts showing the process of the head slowing and then stopping while the torso continues forward. After determining by testing how the helmet actually performs, Dr. Burstein did a computer assimilation. He opined that a football helmet, regardless of its design, cannot prevent an injury to the neck. The helmet is not the object trying to slow down the trunk; the neck is the object trying

to slow down the trunk, and the neck cannot stop the body. As long as the head stops or slows, the trunk is going to squeeze the neck and it may break the neck. The football helmet is intended to protect the skull, scalp and facial features. The helmet has to slow down the head in a controlled way. If the head slows down too fast a fractured skull results, or a concussion. Dr. Burstein further stated that tests performed on all the various helmets showed no appreciable differences between them. They all give equivalent protection to the head. Moreover, there is no way a football helmet can prevent a fracture of the cervical spine with this type of axial loading.

Dr. Burstein testified that there have been no changes to the design of helmet suspensions since 1976 as they relate to protecting the neck.

Dr. Burstein then opined that the 100 MH is not unsafe when put to a use that is reasonably foreseeable, considering the nature and function of the helmet. In his opinion, the 100 MH was not unreasonably dangerous. Dr. Burstein is unfamiliar with the principles of cushioning, but agreed that the purpose of wearing energy absorbing athletic equipment is to minimize the effect of trauma. He stated that if plaintiff was in the same situation without a helmet, he would have sustained the same injury. The helmet would do nothing to protect in those circumstances.

The jury returned a verdict in favor of defendants, and judgment was entered on the verdict. Plaintiff filed a post-trial motion seeking a new trial which was denied. Plaintiff then appealed, requesting that the judgment be reversed on the issue of liability and the cause remanded for a new trial on the issue of damages or, in the alternative, that the judgment be reversed and a new trial ordered.

Plaintiff's sole contention on appeal is that defendants' liability for failure to warn was established as a matter of law. He maintains the football helmet in question is defective because it failed to warn that it could not protect against injuries to the cervical spine which might result in quadriplegia or death.

In a case somewhat analogous to the present case, *Artis v. Fibre Metal Products* (1983), 115 Ill. App. 3d 228, plaintiff received neck and back injuries when his head was struck by a railroad tie while he was wearing a safety helmet manufactured by defendant. The tie struck him on the side of the head, forcing his head down, causing a flexion injury to his neck and leaving him a quadriplegic. Plaintiff's complaint alleged that the helmet was defective because it lacked "energy absorption material for noncoronal impact" and that defendant failed to warn plaintiff of the defective condition. The defendant

moved for summary judgment, which the trial court granted.

The evidence before the court consisted of testimony from plaintiff's and defendant's expert witnesses that the intended function of a safety helmet is to protect against head injury. Defendant's experts testified that the helmet worn by plaintiff had performed that function since plaintiff's injury was to the neck, not the head. Plaintiff's expert testified that he knew of no helmet designed with the intent of protecting the neck.

In affirming the trial court's grant of summary judgment, this court stated:

> "Plaintiff cannot establish a legally cognizable defect merely by indicating a preference for a helmet that would provide neck protection. Not only does such a helmet not exist, even if it did, 'the availability of an alternative design does not translate into a legal duty in products liability.' [Citation.]" 115 Ill. App. 3d 228, 233.

Similarly, in the present case plaintiff alleged that the helmet was defective both in design and in its failure to warn. At trial Dr. Burstein, testifying for the defendant, stated that a football helmet, regardless of its design, cannot prevent an injury to the neck or cervical spine. Rather, the helmet is intended to protect only the skull, scalp and facial features. In his opinion, the 100 MH helmet was not unreasonably dangerous, and there was no duty to warn. Dr. Paul, testifying for the plaintiff, stated that the helmet was unreasonably dangerous and that there was a duty to warn.

By rendering a verdict in favor of defendants, the jury implicitly concluded the helmet contained no design or construction defect and that the helmet did not cause plaintiff's back injury. Plaintiff does not dispute this conclusion of the jury, but argues that the helmet is rendered defective solely by the failure to warn. In plaintiff's words, the manufacturer of protective equipment such as a football helmet creates an "illusion of protection" for the user. Plaintiff argues that this "illusion of protection" must be dispelled by a warning on the helmet.

■ Plaintiff sets forth the well-established rule of law that the failure to warn of a danger inherent in the use of a product may serve as a basis for holding the manufacturer or seller strictly liable in tort if it knew or should have known of the inherent danger. In support of this rule, plaintiff cites numerous cases which involve products such as asbestos (*Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195), the prescription drug Pitocin (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26), electricity (*Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456), and the oral contraceptive Enovid

*(Mahr v. G.D. Searle & Co.* (1979), 72 Ill. App. 3d 540). We conclude that the "inherent danger" of a football helmet, merely a type of protective equipment, cannot persuasively be compared to products such as asbestos, electricity or prescription drugs which themselves each caused the injury complained of.

■ It is well settled that, although a failure to warn can render a product unreasonably dangerous, a duty to warn is not required where the product is not defectively designed or manufactured, and where the possibility of injury results from a common propensity of the product which is open and obvious. See *Zidek v. General Motors Corp.* (1978), 66 Ill. App. 3d 982, 985; Restatement (Second) of Torts sec. 402A, comment j (1965).

In the present case, plaintiff testified that, prior to sustaining his injury, he knew he could get hurt while playing football. However, in response to plaintiff's attorney's question whether he had ever heard of anyone playing football'' who had broken his neck and become a quadriplegic," plaintiff answered in the negative. Plaintiff acknowledged that he had been told by his coaches not to use his head in making a tackle and that he could injure himself if he used the top of the helmet to make a tackle. He also stated that in making the tackle on which he was injured, the first part of his body to come into contact with the ball carrier was his head, and then his shoulder. Plaintiff further acknowledged that his coaches repeatedly instructed him to keep his head up while tackling an opponent.

■ Since the purpose of a warning is to apprise the user of a danger which he is not aware of, so that he can protect himself against it, we find no duty to warn arose in the present case. *Cf. Riordan v. International Armament Corp.* (1985), 132 Ill. App. 3d 642, 648.

For the reasons above, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

NASH, P.J., and REINHARD, J., concur.